IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

IRA C.T.,[1]
      Plaintiff,

          v.                              Civil No. 3:20-cv-980 (DJN)

KILOLO KIJAKAZI,
Acting Commissioner of Social Security
      Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for a period of disability, disability insurance benefits, and supplemental security income under the Social Security Act (the "Act"). Plaintiff was fifty years old at the time of his application and has previous relevant employment as an assistant supervisor at a construction company, carpenter, and church drummer. (R. at 309, 313, 331.) Plaintiff alleges he is unable to work due to Type I diabetes, degenerative disc disease, central canal stenosis, cervical and upper mediastinal lymphadenopathy, pulmonary sarcoidosis, restless leg syndrome, multiple myeloma, sleep apnea, migraines, and neuropathy. (R. at 329.)

On February 5, 2020, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 12-34.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as

Plaintiff seeks review of the ALJ's decision, arguing that the ALJ: (1) failed to consider the medical treatment note of Speech Language Pathologist Tierney Evans, MA, CCC-SLP ("Ms. Evans") as medical opinion evidence; and (2) improperly assessed the medical opinion evidence of Nurse Practitioner Stacy Jones, FNP-C ("Nurse Jones") in accordance with 20 C.F.R. §§ 404.1520c, 416.920c. (Pl.'s Mem. Supp. Soc. Sec. App. 1, ECF No. 32 ("Pl.'s Mem.").) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 31) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 34) be GRANTED and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability, disability insurance benefits, and supplemental security income on October 24, 2018, alleging disability beginning June 6, 2018. (R. at 309-318.) The Social Security Administration ("SSA") denied Plaintiff's claims on January 4, 2019 and again upon reconsideration on March 22, 2019. (R. at 255, 262, 270, 274.) Plaintiff requested a hearing before an ALJ, and a hearing was held on December 10, 2019. (R. at 117-155, 124.) On February 5, 2020, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 15-34.) Plaintiff requested review of the ALJ's decision. (R. at 305.) On October 19, 2020, the SSA Appeals Council denied the request and rendered the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c).[3]

---

Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for supplemental security income.

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does

not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. §§ 404.1545(a), 416.925(a).

At step four, the ALJ assesses whether the claimant can perform his past work given his residual functional capacity. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 18-34.) *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 6, 2018, the date of his application. (R. at 18.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) degenerative disc disease of the lumbar spine with spinal stenosis; (2) diabetes; (3) peripheral neuropathy; (4) inflammatory arthritis; (5) sarcoidosis; and (6) chronic respiratory disorders. (R. at 19.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520 (d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. at 21.)

The ALJ then determined Plaintiff's residual functional capacity. (R. at 23.) Based on the evidence in the record, the ALJ determined that Plaintiff retained the ability to perform light work as defined in 20 CFR 404.1527(b) and 416.967(b) except that:

> [H]e could push and pull as much as he can lift and carry. The claimant could frequently climb ramps and stairs, but only occasionally climb ladders, ropes, or scaffolds. His ability to balance is unlimited. The claimant could frequently kneel, crouch, and stoop, but only occasionally crawl. He is able to perform work requiring up to occasional exposure to extreme heat and humidity. The claimant is able to perform work that requires no exposure to fumes, odors, dusts, gases, pulmonary irritants, and poor ventilation.

(R. at 23.)

The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," including the medical opinions

and prior administrative medical findings, in accordance with the regulations. (R. at 23.) Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff is able to perform past relevant work as a drummer, which is sedentary in exertional level, skilled in nature, and has a specific vocational preparation of 8. (R. at 32.) The ALJ noted that Plaintiff described performing this work at the light exertional level. (R. at 32-33.) She also explained that the vocational expert testified that Plaintiff's past relevant work as a carpenter is not compatible with the assessed residual functional capacity because of his restriction on climbing ladders, ropes, or scaffolds, which is required in carpentry work. (R. at 33.)

Although not required to proceed to step five, the ALJ nonetheless explained that there are other jobs that exist in significant numbers in the national economy that Plaintiff also can perform, considering Plaintiff's age, education, work experience, and residual functional capacity. (R. at 33.) In making her findings, the ALJ considered the vocational expert's testimony, who opined that Plaintiff could perform the requirements of representative occupations such as cashier II, router, and classifier. (R. at 34.) Accordingly, the ALJ concluded that Plaintiff is not disabled under the Act. (R. at 34.)

## IV. ANALYSIS

Plaintiff requests that this Court recommend remand on the issue of whether the ALJ properly evaluated the medical treatment note of Ms. Evans and the medical opinion evidence of Nurse Jones. (Pl.'s Mem. at 1.) First, with regards to Ms. Evans, Plaintiff alleges that the ALJ failed to: (1) articulate how persuasive the ALJ found this opinion; (2) adequately describe the nature of the opinion; or (3) even mention the existence of Ms. Evans. (Pl.'s Mem. at 10.) Second, as to Nurse Jones' opinion, Plaintiff avers that the ALJ erred by finding it unpersuasive on the grounds that Nurse Jones did not discuss the objective medical findings underlying the nurse's

opinion, which Plaintiff contends Nurse Jones did. (Pl.'s Mem. at 13.) Further, Plaintiff alleges that the ALJ's conclusion regarding Nurse Jones's opinion "ignored the nature of Plaintiff's impairments, and mischaracterized Plaintiff's ability to work." (Pl.'s Mem. at 13.)

Defendant responds that the ALJ "correctly evaluated the medical opinion evidence pursuant to the applicable regulatory scheme as part of her residual functional capacity assessment, and her findings are supported by substantial evidence in the record." ((Def.'s Mot. Summ. J. 9, (ECF No. 34) ("Def.'s Mem.").) In support, Defendant argues that the ALJ was not required to discuss Ms. Evans's clinical notes form because it is not a "medical opinion" as defined by the regulations, nor was the ALJ required to discuss each piece of evidence "in the four thousand pages of medical records." (Def.'s Mem. at 15-16.) Further, even if considered as a medical opinion, Defendant contends that Ms. Evans's treatment note recommending home supervision "initially upon discharge" would not "qualify as an impairment expected to last for a year and prevent Plaintiff from substantial gainful activity." (Def.'s Mem. at 15.) As such, Plaintiff would not prevail in showing that this treatment note related to an impairment rendering him disabled. As for Nurse Jones's medical opinion, Defendant contends that the ALJ's decision "thoroughly addressed the inconsistencies between [Nurse Jones's] check-box medical source statement and the balance of the medical information in the record." (Def.'s Mem. at 16.) Moreover, Defendant argues the ALJ's findings are supported by substantial evidence and accord with the new regulations. (Def.'s Mem. at 16.)

For the reasons that follow, this Court finds that the ALJ did not err in her assessment of the medical opinion evidence, and substantial evidence supports the ALJ's decision to find Plaintiff not disabled under the Act.

**A. The ALJ Did Not Err by Failing to Assess Ms. Evans's Treatment Note as a Medical Opinion Under the Regulations.**

*1. Plaintiff's Treatment with Ms. Evans.*

Ms. Evans, a speech-language pathologist, performed a cognitive-linguistic evaluation of Plaintiff on June 20, 2019, a day after Plaintiff sustained injuries in a fall from a ladder. (R. at 3721, 3725.) At the beginning of her treatment note, Ms. Evans wrote that Plaintiff endorsed "baseline cognitive difficulties that have developed over the last year or more." (R. at 3725.) As a result, Ms. Evans felt she was "unable to fully determine the impact of recent fall on baseline cognitive functioning." (R. at 3725.)

Nonetheless, during her sixty-minute evaluation, Ms. Evans noted deficits in "tasks targeting attention, calculations, language (specifically word fluency, suspect related to attention deficits), abstract thought, and delayed recall." (R. at 3725.) Ms. Evans observed Plaintiff's "slow process during testing," and found that he was "often slow to respond to clinician statements or prompts." (R. at 3725.) She questioned the "potential impact of Plaintiff's sarcoidosis on overall cognitive presentation, given that he reports baseline impairments." (R. at 3725.) Although Ms. Evans acknowledged that Plaintiff exhibited "insight into deficits," she worried that Plaintiff would be a danger to himself as he "lives alone and exhibits poor attention and memory during tasks." (R. at 3725.) Because of this, Ms. Evans recommended that he receive supervision initially upon his return home, particularly "with tasks requiring higher-level attention/memory." (R. at 3725.) She also recommended that he receive continual speech language pathology services "to assess patient's functional cognition in the home setting, as he has reported requirement to use memory strategies when performing tasks such as food preparation." (R. at 3725.) Further, she

recommended outpatient speech language pathology if home health was unavailable, as well as a follow-up visit to the concussion clinic. (R. at 3725.)

> ### 2. *The ALJ Did Not Err by Failing to Analyze Ms. Evans's Treatment Note as a Medical Opinion.*

Plaintiff argues that the ALJ erred by failing to articulate the persuasiveness of Ms. Evans's treatment note because it meets the requirements of a medical opinion. (Pl.'s Mem. at 9-10.) In response, Defendant contends that Ms. Evans's treatment note is not a medical opinion under the plain language of 20 C.F.R. § 404.1513(a)(2) and 416.913(a)(2) because it does not describe what Plaintiff may still do despite his impairments nor whether he has impairment-related limitations.

The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . ." 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 404.1513(a)(3) 416.913(a)(3) (defining these categories of information as "other medical evidence").

With this definition in mind, the Court turns to Ms. Evans's June 20, 2019 treatment note. Many of her findings do not appear to reflect medical opinions because they simply memorialize what Plaintiff told her. (*See* R. at 3723 ("He endorses a history of cognitive difficulty for a year or more prior to this fall; characterized these difficulties as difficulty with memory. Stated that he has to take notes and write reminders; also sets alarms while cooking.").) They also appear to be judgments about the nature and severity of Plaintiff's impairments. (*See* R. at 3725 (noting that Plaintiff "exhibit[ed] insight into [his] deficits," but nonetheless was "at [an] elevated safety risk to himself and others upon return home, given that he lives alone and exhibits poor attention and

9

memory during tasks.").) Although Ms. Evans's consultation did not detail a specific diagnosis, she questioned the impact of his sarcoidosis on overall cognitive presentation and recommended further speech language therapy services to assess his functional cognition in the home setting. (R. at 3725.) These types of notes do not constitute medical opinions because they reflect judgments about the nature and severity of Plaintiff's impairments, his prognosis, clinical findings, and prescribed treatment.

The only statements in Ms. Evans's treatment note which could possibly be construed as a medical opinion is Ms. Evans's observations that Plaintiff has "deficits" in tasks targeting attention, calculations, language, abstract thought, and memory, and that he "exhibited slow processing . . . and was often slow to respond . . . ." (R. at 3725.). However, Ms. Evans's statements that Plaintiff has "deficits" in these areas and is both "slow" and has "slow processing" is vague and conclusory and does not explain how Plaintiff's impairments would affect his ability to perform the mental demands of work activities. (R. at 3725.) Thus, general "deficits" or "slowness" are not enough to support a finding of Ms. Evans's treatment notes as a medical opinion, since the descriptions are not clear on what specific work activities Plaintiff cannot perform because of his impairments. Accordingly, the ALJ did not err by declining to specifically evaluate Ms. Evans's treatment note.

**B. The ALJ Did Not Err in Her Evaluation of Nurse Jones's Medical Opinion.**

Plaintiff next argues that the ALJ failed "to provide any legally sufficient explanation for her assessment of [Nurse Jones's] opinion" and "merely mischaracterize[d] the evidence of record to justify dismissing" Nurse Jones's medical opinion. (Pl.'s Mem. at 13, 15.) Defendant responds that the ALJ appropriately assessed Nurse Jones's medical opinion based on the supportability and

consistency factors set forth in the regulations, and substantial evidence supports the ALJ's findings. (Def.'s Mem. at 16-21.)

> 1. *Evaluating Medical Opinion Evidence for Claims Filed on or After March 27, 2017.*

As an initial matter, for claims filed on or after March 27, 2017, revised regulations apply that change the framework for how an ALJ must evaluate medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. The revised regulations provide that the ALJ will no longer "give any specific evidentiary weight...to any medical opinion(s) . . .." *Revisions to Rules*, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; *see* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

Under the regulations,[4] the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id*. §§ 404.1520c, 416.920c(a), (b), (c)(1)– (5). Supportability and consistency are the "most important" factors, and the ALJ must discuss how these factors were considered in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). Supportability and consistency are explained in the regulations:

---

[4] Because Plaintiff filed his disability claim after March 27, 2017, Section 416.920c, which sets forth revised rules regarding the assessment of medical opinion evidence, applies here.

(1) *Supportability*. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) *Consistency*. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ may, but is not required to, explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). However, when two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how "the other most persuasive factors in paragraphs (c)(3) through (c)(5)" were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3).

### 2. *Nurse Jones's Opinion.*

On November 14, 2019, Nurse Jones filled out a four-page medical source statement in which she provided her medical opinion about Plaintiff's ability to do work-related activities. (R. at 5300-5303.) The form asked the nurse to check the appropriate boxes, respond to questions about Plaintiff's ability to perform activities, and identify factors, such as the "particular medical signs, laboratory findings, or other factors" that support the nurse's assessment of any limitations. (R. at 5300.) With regards to the exertional limitations, Nurse Jones opined that Plaintiff's ability to lift and carry was affected by his impairments, limiting him to lifting ten pounds occasionally, but declining to state how much he could lift frequently. (R. at 5300.) Nurse Jones also stated that Plaintiff's ability to stand or walk was limited to at least two hours in an eight-hour workday, and that he must periodically alternate sitting and standing to relieve pain or discomfort. (R. at 5300-

01.) She found that his ability to push or pull was limited in his upper and lower extremities, adding that he has "peripheral neuropathy in hands and feet" and "is at risk for falls." (R. at 5301.) Subsequently, she encouraged him to limit these activities "for risk of fall and bodily injury." (R. at 5301.)

With respect to Plaintiff's postural limitations, Nurse Jones noted that he could never climb ramps, ladders, stairs, ropes, or scaffolds. (R. at 5301.) She opined that he could occasionally balance, crouch, and stoop, and frequently kneel and crawl.[5] (R. at 5301.) Once more citing Plaintiff's peripheral neuropathy "and a history of falls with fractured ribs," Nurse Jones also pointed to Plaintiff's "chronic back pain" as her reasoning for limiting his "up and down movements along with bending." (R. at 5301.)

When asked to opine on Plaintiff's manipulative limitations, Nurse Jones stated that he was unlimited in his gross manipulation and reaching abilities but limited in his fine manipulation and feeling abilities. (R. at 5302.) She noted that he can occasionally feel and frequently finger. (R. at 5302.) When asked to describe the medical or clinical findings that support her conclusions, Nurse Jones explained that "[Plaintiff] has peripheral neuropathy with decreased sensation in hands [and] feet. History of dropping items and falls. I would avoid a lot of manipulation of items." (R. at 5302.)

While Nurse Jones found that Plaintiff was not limited in his visual or communicative functioning, his impairments limit his ability to work in certain environmental conditions. (R. at 5303.) Specifically, Nurse Jones found that his impairments interfere with his ability to work in environments with temperature extremes, noise, dust, vibration, humidity/wetness, hazards (from

---

[5] The Medical Source Statement defines "frequently" as being less than two-thirds of an eight-hour work day, and "occasionally" as being less than one-third of an eight-hour work day. (R. at 5301.)

heights or machinery), and fumes, odors, chemicals, and gases. (R. at 5303.) When asked to explain the clinical or medical findings underlying her conclusions, Nurse Jones noted that Plaintiff "has a history of sarcoidosis, peripheral neuropathy. [Plaintiff] is sensitive to extreme changes. Weather changes/dust can impact [b]reathing." (R. at 5303.)

   3.   *Analysis of the ALJ's Assessment of Nurse Jones's Opinions.*

In her decision, the ALJ summarized Nurse Jones's findings and found them "not persuasive." (R. at 32.) The ALJ reasoned that:

> While [Nurse Jones] supports her opinion by discussing the impairments that cause the limitations she found, her assessment is mostly a review of the claimant's symptoms and diagnosis and does not include a discussion of the objective medical findings, which as discussed, were generally mild. Additionally, while the undersigned acknowledges that [Nurse Jones] had the opportunity to examine and treat the claimant, her opinion fails to address the claimant's admission that his symptoms and function had improved or his continued work as a carpenter. Therefore, the undersigned finds that this opinion is unpersuasive.

 (R. at 32.) It is clear from the plain language in the ALJ's decision that she explicitly articulated the supportability and consistency of Nurse Jones's opinions in accordance with the regulations and built a logical bridge from the evidence to her conclusion.

As part of her assessment, the ALJ found that Nurse Jones's opinions did not account for the objective medical findings, which the ALJ found to be "generally mild." (R. at 32.) Plaintiff argues instead that Nurse Jones appropriately based her findings on the objective medical evidence because she addressed Plaintiff's reported "decreased sensation in his hands and feet . . .." (Pl.'s Mem. at 13.) However, "statements to physicians by way of history or complaint do not constitute objective medical evidence, and the recording of a claimant's complaints by a physician does not transform those complaints into objective clinical evidence." *King v. Barnhart*, 6:04cv00053, 2005 U.S. Dist. LEXIS 28559, 2005 WL 3087583, at *4 (W.D. Va. Nov. 16, 2005) (citing *Craig v.*

*Chater* 76 F.3d 585, 590 n.2 (4th Cir. 1996). Moreover, the ALJ found that Nurse Jones's opinion did not account for Plaintiff's symptom and function improvement, nor his continued work as a carpenter. (R. at 32.) As to the latter point, Plaintiff contends that there "is no actual indication that Plaintiff was performing carpentry work or any activity that could be construed as 'continued work as a carpenter'" since Plaintiff's alleged onset date of disability. (Pl.'s Mem. at 14.) The Court will address these issues in turn.

The ALJ's written decision shows that she carefully considered the objective medical evidence and other evidence demonstrating Plaintiff's symptom and function improvement. The ALJ explained that imaging from April 2017 revealed that Plaintiff had a large disc herniation at the L4-5 level with moderate spinal stenosis, which was likely impinging on the right L4 and L5 nerve roots. (R. at 26.) She discussed how treatment notes from Nurse Jones indicated that she "examined the claimant and noted that he was wearing a back brace, but he was able to ambulate with a steady gait and was in no acute distress." (R. at 26, citing R. at 2468.) Upon physical examination earlier that month, Plaintiff was reportedly sitting comfortably in a chair. (R. at 26, citing R. at 2501.) In August 2018, Plaintiff's Hemoglobin A1C level measured 9.5%, and his diabetes mellitus "was associated with peripheral neuropathy . . . ." (R. at 26, citing R. at 2360.) On examination in October 2018, "he exhibited diffuse muscular tenderness, consistent with his diagnosis of inflammatory arthritis, and although his peripheral neuropathy was stable, he continued to exhibit significant parethesias [sic]." (R. at 26, citing R. at 2376.) Nonetheless, he maintained a "full range of motion, had good range of motion in his spine with no tenderness to palpation in the spinous process and no swollen joints." (R. at 26, citing R. at 2374.)

At a hematology appointment at the end of October 2018, Plaintiff reported that "he had been doing well," although had some muscle soreness, and exhibited "joint tenderness to

palpation" that he acknowledged "was intermittent." (R. at 26, citing R. at 2308.) His provider found that his "cranial nerves were intact, and there were no focal deficits noted during the examination." (R. at 26, citing R. at 2309.) Further, his "cardiovascular and respiratory examinations were unremarkable." (R. at 26, citing R. at 2309.)

Notably, Plaintiff "admitted in October 2018 that his back and neuropathy pain had improved when he restarted Cymbalta and Pamelor." (R. at 26, citing R. at 2360.) (internal citation omitted). He alleged some physical limitations and "continued to exhibit significant parethesias [sic]," but "reported that he was exercising five to six times per week by walking, indicated that he lived alone, and relayed that he was independent in his home environment." (R. at 26, citing R. at 2359.)

During a December 2018 outpatient appointment, Plaintiff's gait was steady, and his physical examination was "generally unremarkable." (R. at 26, citing R. 3298.) Although his diabetes mellitus was found to be "uncontrolled with a most recent [Hemoglobin A1C level] at 9%," he had no complaints as of his January 16, 2019 appointment, reported doing well overall. (R. at 26-27, citing R. at 3319-20.)

On January 22, 2019, Plaintiff's rheumatologist indicated that Plaintiff's polyarthralgia appeared to be stable and non-inflammatory. (R. at 27, citing R. at 3249.) On examination, he had some slow speech, joint tenderness to palpation, and some equivocal skin thickening over the interphalangeal space. (R. at 27, citing R. at 3248.) Plaintiff was found to be in no acute distress, his cardiovascular and respiratory examinations were normal, and he maintained good range of motion in most of the joints where he showed evidence of tenderness to palpation of some joints. (R. at 27, citing R. at 3248.) On February 4, 2019, imaging of Plaintiff's forearm and elbow following a fall showed "no findings consistent with acute osseous abnormality of the right elbow

16

or forearm." (R. at 27, citing R. at 3204.) During a February 28, 2019 appointment, Plaintiff's pulmonologist noted that, "in addition to his stable pulmonary function test, his transthoracic echocardiogram (TTE) from October 2018 was largely normal and stable compared to previous imaging." (R. at 27, citing R. at 3107.) The ALJ cited to a record in which a provider "indicated that there was no clear etiology for the claimant's alleged symptoms," and that during examination, Plaintiff appeared tired and slow to answer some questions, despite sitting comfortably in a chair and in a pleasant mood. (R. at 27, citing R. at 3105, 3107.) The pulmonologist "stated that there were no physical examination signs consistent with heart failure or pulmonary hypertension and [Plaintiff's] symptoms could be related to poorly controlled sarcoidosis." (R. at 27, citing R. at 3107.)

In March and April 2019, Plaintiff's Hemoglobin A1C levels increased, "reflecting poor control of his diabetes." (R. at 27, citing R. at 3433, 3492, 4450.) On examination Plaintiff showed some evidence of slowed speech, "but remained alert, in no acute distress, and his cardiovascular and respiratory examinations remained unremarkable." (R. at 27, citing R. at 3432.) Plaintiff was found able to move all his extremities and, despite "some mild skin thickening over the interphalangeal space, which was visualized during prior examinations, . . . he failed to exhibit any joint swelling or tenderness to palpation." (R. at 27, citing R at 3432.) On May 6, 2019, Plaintiff was reportedly doing well, although he continued to "experience some occasional joint pain" that was chronic in nature, but denied chest pain, dyspnea, or abdominal pain. (R. at 27, citing R. at 4345.) On examination, he was found to have normal range of motion in his musculoskeletal system, with no evidence of swelling or deformity. (R. at 28, citing R. at 4347.) On May 22, 2019, Plaintiff had an increased heart rate, although his blood pressure and respiratory and cardiovascular examinations were unremarkable. (R. at 28, citing R. at 4219.) At that appointment, Plaintiff

ambulated with a normal gait while wearing a back brace, which was not prescribed to him. (R. at 28, 4219.) Plaintiff denied chest pain or shortness of breath but noted that he had intermittent lightheadedness for one month, which worsened with changing positions. (R. at 28, citing R. at 4215.)

Plaintiff presented to the emergency department on June 19, 2019 after falling from a ladder. (R. at 28, citing R. at 3535, 3647.) A diagnostic workup revealed that Plaintiff sustained "a left distal clavicle fracture, L1-L2 transverse process fractures, rib fractures, and small left pneumothorax." (R. at 28, citing R. at 3736.) During his weeklong hospitalization, Plaintiff "exhibited persistent tachycardia, but his EKG and troponin levels were negative." (R. at 28, citing R. at 3736.) He "had chronic findings related to his sarcoidosis," and was discharged after controlling for hypoglycemia. (R. at 28, citing R. at 3736.)

Plaintiff reported during a July 9, 2019 appointment that his pain level was 2/10 without the use of Oxycodone or Lidocaine, and he used a cane occasionally. (R. at 28, citing R. at 4589.) His transthoracic echocardiogram from June 2019 "was normal and notably, the claimant had a normal ejection fraction." (R. at 28, citing R. at 5198.) His rheumatologist indicated that Plaintiff's polyarthralgia and peripheral neuropathy "remained stable." (R. at 28, citing R. at 5199.) At a July 23, 2019 rheumatology follow-up appointment, Plaintiff reported doing "pretty well" despite breaking his clavicle a month earlier. (R. at 28, citing R. at 5193.) He reported chest pains approximately two or three times a month, and continued to experience paresthesia, muscle pain, and stiffness in his joints. (R. at 28, citing R. at 5194.) Nonetheless, on examination he exhibited "some slowed speech, and some mild skin changes, as well as tenderness to palpation in his joints, but generally, he maintained full range of motion in most of his joints, as well as in his cervical spine." (R. at 28, citing R. at 5196-97.)

Plaintiff's Hemoglobin A1C level increased to 11% in August 2019, although his "physical examination remained generally unremarkable, he continued to ambulate with a steady gait, and no abnormalities were noted in his cardiovascular or respiratory systems." (R. at 28, citing R. at 4995.) According to the ALJ's assessment, "four days earlier, his physical examination revealed that his sensation was completely intact to light touch in the axillary median and ulnar, as well as in the radial nerve distribution and he remained 5/5 strength in his deltoids, triceps, and biceps." (R. at 28-29, citing R. at 5054.) Additionally, his "left distal clavicle fracture was healing." (R. at 29, citing R. at 5054.)

On September 22, 2019, Plaintiff reported that overall, he was "doing great" and had no pain or limitations in his range of motion. (R. at 29, citing R. at 4845.) He told his medical provider that he could "lift heavy objects without pain" and had no complaints, despite imaging showing that he had a fibrous nonunion of the distal clavicle. (R. at 29, citing R. at 4845, 4850.) He described his mental and physical health as "good," and it was recommended that he continue to treat his orthopedic condition non-operatively, and to consider physical therapy. (R. at 29, citing R. at 4842, 4850.)

Having reviewed the objective medical evidence corroborating Plaintiff's claim of disability, the undersigned finds that substantial evidence supports the ALJ's reasoning that Nurse Jones's opinion did not include a discussion of the objective medical findings. The ALJ noted that Plaintiff has had "generally unremarkable pulmonary and cardiac examinations and his gait remained stable. Although the claimant contends with diabetes mellitus with peripheral neuropathy and reported paresthesia, he was not always consistent with his prescribed regimen." (R. at 29.) Additionally, the ALJ pointed to evidence suggesting the inconsistency between Plaintiff's self-assessed abilities and the objective medical evidence. For instance, Plaintiff told the ALJ at his

hearing that he denied saying that he could lift heavy objects. (R. at 29, citing R. at 125-26.) Yet, the ALJ highlighted treatment notes from an examination in which Plaintiff was found to have full strength in his biceps, triceps, and deltoids, fully intact sensation in the axillary, medial, radial, and ulnar nerve distribution, and normal motor function during neurologic testing. (R. at 29, citing R. at 4849.) As stated above, Nurse Jones found that Plaintiff could occasionally lift no more than ten pounds, which accords with Plaintiff's subjective complaints, but not the objective medical evidence. (R. at 5300.) Thus, it was not unreasonable for the ALJ to find Nurse Jones's opinion unpersuasive on the basis that it did not account for the objective medical findings. (R. at 32.)

To the extent that Plaintiff contends that the ALJ "mischaracterized" Plaintiff's limitations by finding that he may have been doing carpentry work after his alleged onset date, the undersigned finds that it was appropriate for the ALJ to explore whether Plaintiff had been doing carpentry work when such evidence was included in the medical record. At Plaintiff's hearing, the ALJ questioned him about a treatment note from July 23, 2019, in which his provider wrote that Plaintiff continued "to have symptoms [with] mild to moderate exertion but it has not inhibited his work as a carpenter yet." (R. at 124-25, 5193.) The ALJ told Plaintiff that this note "indicate[d] that you're still doing carpenter work around that time. Can you explain that to me?" (R. at 124.) In response, Plaintiff provided context that he had been working on a ladder and fell while fixing a gutter clip, and when asked if that would be considered carpentry, he replied, "Yes, that will be carpentry, but I was just, just fixing the clip." (R. at 124.) The ALJ probed further, asking Plaintiff why his provider would have "said something that seems to indicate you were still working as a carpenter," to which Plaintiff replied, "I guess would just doing things around the house . . . ." (R. at 124-25.) He agreed that helping his parents out in this regard would be "doing carpentry work," as he was "showing [his] father and [his] nephew how to do things . . . ." (R. at 125.) Plaintiff contends that

"[t]here is no actual indication that [he] was performing carpentry work or any activity that could be construed as 'continued work as a carpenter.'" (Pl.'s Mem. at 14.) However, it was not unreasonable for the ALJ to account for Plaintiff's own testimony, in addition to the July 23, 2019 treatment note, when she assessed the supportability and consistency of Nurse Jones's opinion and the basis for her opinions. (Pl.'s Mem. at 14; s*ee* R. at 32.)

Not only did the ALJ account for the supportability and consistency of Nurse Jones's opinion in accordance with the regulations, she also acknowledged Nurse Jones's treating relationship with Plaintiff pursuant to 20 C.F.R. 404.1520c(c)(3) and 416.920c(c)(3). (R. at 32 ("[W]hile the undersigned acknowledges that [Nurse Jones] had the opportunity to examine and treat [Plaintiff], her opinion fails to address [Plaintiff's] admission that his symptoms and function had improved or his continued work as a carpenter.") Moreover, the ALJ articulated that she found Nurse Jones's opinion unpersuasive because it did not account for Plaintiff's admissions that his symptoms improved. A review of the record indicates that the ALJ built a logical bridge from the evidence to her conclusion, as the records indicate instances in which Plaintiff reported improvement in his symptoms.

As stated above, the regulations require that the ALJ explain how she considered the consistency and supportability of the medical opinion and why—based on the evidence—the ALJ reached the particular conclusion she did as to the persuasiveness of the opinion. *See* 20 C.F.R. § 404.1520c(a)–(b). The ALJ satisfied that standard here. Upon review of the record and the ALJ's decision, the Court finds that substantial evidence supports the ALJ's conclusion that Nurse Jones's opinion was not persuasive.

## V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 31) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 34) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge David J. Novak and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/ MRC_____
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: June 27, 2022